IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| JEFFERY B DANIELS, | § | |
| | § | |
| | § | CIVIL ACTION NO.  4:15-CV-00702-CAN |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| TEXAS DEPARTMENT OF | § | |
| TRANSPORTATION, | § | |
| | § | |
| Defendant. | | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendants Texas Department of Transportation's ("TxDOT") and Executive Director James M. Bass's, in his official capacity, ("Bass") (collectively "Defendants") Motion for Summary Judgment ("Motion for Summary Judgment") [Dkt. 30] and Defendants' Motion to Strike Plaintiff's Affidavit as a "Sham Affidavit" ("Motion to Strike") [Dkt. 45].  After reviewing the Motion for Summary Judgment, the Motion to Strike, and all other relevant filings, the Court finds that Defendants' Motion for Summary Judgment [Dkt. 30] should be **GRANTED IN PART AND DENIED IN PART** and that Defendants' Motion to Strike [Dkt. 45] should be **DENIED**.

## BACKGROUND

Plaintiff filed this suit on October 13, 2015, alleging TxDOT—itself and by and through Bass—had engaged in racial and disability discrimination and retaliation through its "disciplinary actions, harassment, work assignments, and work crew segregation" [Dkts. 1 at 2; 20-1 at 3].  Plaintiff claims that his status as an African American man and/or as a physically disabled person led TxDOT to terminate him from his position as a "Maintenance Tech" in

Sherman, Texas, on July 31, 2014 [Dkt. 20-1 at 3].  Plaintiff also describes "several disciplinary actions that had been issued to [him] over a four-year period" prior to his termination and used as a basis for his termination as "either too old to have any relevance [to the termination], or false or contrived[] . . . [in] an effort to paper [Plaintiff's] file to make [him] look as bad as possible[.]"  *Id.* at 5.  Plaintiff advances three distinct theories of liability (under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act ("Section 504")) premised on his alleged physical disability and/or his status as an African American TxDOT employee.[1]

TxDOT hired Plaintiff in early September, 1996 [Dkt. 30-1 at 35].  During the time period relevant to this case, Plaintiff worked as an at-will "General Transportation Tech III"—a "Maintenance Worker . . . in a non-supervisory position"—in TxDOT's "Grayson County Maintenance Office, located in the Sherman Area Maintenance Office in Sherman[, Texas]."  *Id.* at 2-3.  From February 2, 2012 until Plaintiff's termination on July 31, 2014, Plaintiff's supervisor was John Grissom ("Grissom"), the Grayson County Maintenance Supervisor.  *Id.* at 3.  Plaintiff also worked with Assistant Maintenance Supervisor Clint Traylor ("Traylor") and Crew Leader Barry Nance ("Nance") during the relevant time period [Dkts. 20-1 at 9-10; 30-1 at 3].  Since May 11, 2013, Paul Montgomery ("Montgomery") has held the District Engineer position for the Paris District (which encompasses Grayson County), and, by virtue of his position, "[was] responsible for the hiring and job terminations within the [Paris] District" during that time [Dkt. 30-2 at 2-3].  Catherine Hostetler ("Hostetler") worked as a Human Resources

---

[1] Plaintiff raised claims of racial discrimination and retaliation under both Title VII and 42 U.S.C. § 1981 as well as claims of disability discrimination, disability retaliation, and failure to accommodate under both the ADA and Section 504 [Dkt. 1].  At hearing before the Court and in his summary judgment briefing, however, Plaintiff dropped and/or indicated he did not oppose dismissal of his claims of racial discrimination and retaliation under 42 U.S.C. § 1981 and/or his disability retaliation and failure to accommodate claims under the ADA and Section 504.

Specialist for the Paris District during the relevant time period and conducted the investigation into Plaintiff's conduct and disciplinary history on which Montgomery relied in deciding to terminate Plaintiff [Dkts. 30-1 at 2-3; 30-2 at 2-3].

Doctors diagnosed Plaintiff in 2012 "with blocked and partially blocked arteries" after Plaintiff began to "notice that he would quickly tire, be unable to exert himself physically to bend, lift, and climb, . . . would have sudden dizziness, and . . . would need to sit and rest . . . until his dizziness would stop and his strength would return" [Dkt. 20-1 at 4, 8; *see also* Dkts. 31-2 at 7; 50 at 2 (Defendants admit Plaintiff was diagnosed with blocked and partially blocked arteries)]. Following his diagnosis, Plaintiff "received surgical treatment and medication to address his medical condition" [Dkt. 20-1 at 5]. Also in late 2013 into early 2014, he began to request accommodations for his condition at work, namely "time away . . . for medical appointments" and "periodic breaks for a few minutes to rest/recuperate during the workday." *Id.* at 5. Plaintiff's condition admittedly began to require "more frequent doctor visits . . . toward the end of 2013 and the beginning of 2014." *Id.*

Plaintiff claims that, in or around this time and in response to these heightened demands, Grissom would harass Plaintiff "about his need for time off" and "about his need to rest" while at work. *Id.* Plaintiff also attributes Grissom's alleged harassment to racial discrimination: he asserts that, during his employ at TxDOT, supervisors and coworkers consistently subjected him (and other racial minorities) to racial slurs and name-calling [Dkt. 20-1 at 11-12].[2] Plaintiff points to "disciplinary actions" and TxDOT's "negative comments against [him] in May, June,

---

[2] The Court expands on these assertions *infra*, as they relate specifically to Plaintiff's *prima facie* Title VII claims and pretext arguments.

and July of 2014 based upon false or contrived allegations and assertions" as further evidence of Defendants' alleged disability and race discrimination.  *Id.* at 9.[3]

Plaintiff alleges this discrimination and harassment culminated in a disagreement between Plaintiff, Grissom, and Traylor on July 23, 2014 (the "July 23, 2014 Incident").  *Id.* at 8-9.  Plaintiff claims he notified "TxDOT management" on or before July 23, 2014 of a doctor's appointment he had scheduled to attend after work that day.  *See id.* at 8.[4]  Grissom and Traylor each testified to the contrary that Plaintiff had informed neither of them about needing to leave work at a certain time [Dkts. 30-1 at 95; 30-4 at 14; 30-6 at 9], and Nance testified that he could not recall whether Plaintiff had informed anyone or not [Dkt. 30-8 at 49].  In any event, as the work day came to a close, Grissom (through Nance) notified Plaintiff's work crew that they would all need to remain in order to complete the job on which they were then working.  *Id.* at 9.  Plaintiff asserts he resisted over the radio, telling Grissom and Traylor that the crew did not need to stay later (and that he would not stay later).  Plaintiff claims he spoke with Grissom and Traylor in person as well.  *Id.*  Grissom and Traylor each testified Plaintiff was disruptive, insubordinate, and rude, both over the radio, and in person [Dkts. 30-4 at 4-5, 12-13; 30-6 at 5-7].

Grissom reported the July 23, 2014 Incident to Hostetler on July 24, 2014 [Dkt. 30-1 at 2].  Hostetler then "conducted an independent investigation in which [Hostetler] collected . . . witness statements from Mr. Grissom and Mr. Traylor[,] . . . reviewed [Plaintiff's] disciplinary file[,] . . . [and] determined . . . that [Plaintiff] was continuing to act inappropriately and

---

[3] The Court reiterates here its earlier finding that such claims are time-barred [Dkt. 59 at 11 (granting Defendants' Motion to Dismiss "as to the Statute of Limitations argument" contained therein)].  This finding does not prevent either Party from relying on those disciplinary actions and negative employment reviews as evidence, however.  *Cf. Rutherford v. Harris Cty., Tex.*, 197 F.3d 173, 186 (5th Cir. 1999) (citing *United Air Lines, Inc. v. Evans*, 431 U.S. 533, 558 (1977)).
[4] Plaintiff later testified he "did not mention" needing to leave work by a specific time to any supervisor until he talked to Nance at 11:30 on July 23, 2014 [Dkt. 30-3 at 6-7].

unprofessionally at his job." *Id.* at 3.  Hostetler did not collect a statement from Nance.  Relying

on Hostetler's investigation and report, Montgomery "made the decision to terminate the

employment of Plaintiff . . . on July 23, 2014" based upon his review of Plaintiff's alleged

misconduct and Plaintiff's "record of prior disciplinary action" relating to "misconduct on the

job."  [Dkt. 30-2 at 3].  Specifically, Montgomery cited the July 23, 2014 Incident alongside four

incidents from Plaintiff's disciplinary file, which are excerpted in relevant part below, in support

of his decision to terminate Plaintiff's employment:

> **Case Number**         **Letter Date**
> 01110004              09/23/2010
> [Plaintiff] received a written reprimand for behavior that negatively affects the
> work productivity and shows lack of respect for others.
>
> 01120002              10/10/2011
> [Plaintiff] received 12 months [sic] probation for inappropriate behavior and
> unprofessional conduct.
>
> 6/2014 Mid-cycle—rated "N" on "Team Work" and "Follows instructions" due to
> poor attitude.
>
> 5/2014—Warning with regards to not working with team.

[Dkt. 30-2 at 7-8; *see also* Dkt. 30-1 at 55-56].  Hostetler's report as reflected in the record did

not include positive reviews received by Plaintiff in 2012 and 2013.  Montgomery determined

that these incidents when considered together made "clear that [Plaintiff] had a history of acting

inappropriately and unprofessionally at his job" [Dkt. 30-2 at 4].  Hostetler averred that such

determination "complied with TxDOT's progressive disciplinary policy" whereby TxDOT

generally employs "'a four step process that uses increasingly more severe actions to coach

employees who are not meeting Department expectations'" [Dkt. 30-1 at 4 (quoting Dkt. 30-1 at

52 (hereinafter "2014 Policy"))].  Hostetler cited both the 2014 Policy and TxDOT's 2013

Human Resources Manual (hereinafter "2013 Policy") to support the proposition that

"disciplinary actions do not expire and repeated offenses of a similar nature will progress an employee further down the disciplinary path."  *Id.* at 4.[5]  Following his termination and within 300 days of the July 23, 2014 Incident, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission and, on or after July 22, 2015, received his "right to sue" letter for his Title VII and ADA claims.  As noted, Plaintiff commenced this suit on October 13, 2015.

On August 12, 2016, Defendants filed their Motion for Summary Judgment, seeking judgment as a matter of law on each of Plaintiff's Title VII, ADA, and Section 504 claims [Dkt. 30].  Defendants argue therein that Plaintiff fails to establish (1) a *prima facie* race discrimination or retaliation case (under Title VII), (2)  a *prima facie* disability discrimination case (under the ADA or Section 504), or (3) that Defendants' proffered reasons for terminating Plaintiff were pretext for discrimination (under Title VII, the ADA, or Section 504).  *Id.*  Plaintiff filed his Response and Brief in Opposition to Defendant's [sic] Motion for Summary Judgment ("Response") on August 27, 2016, arguing the Motion for Summary Judgment should be denied because Plaintiff raised a genuine issue of material fact on his Title VII discrimination and retaliation claims, as well as on his ADA and Section 504 discrimination claims [Dkt. 31].  Plaintiff contends therein that Plaintiff established a *prima facie* case of race discrimination, of Title VII retaliation, and of disability discrimination.  *Id.*  Additionally, Plaintiff asserts, he

---

[5] The 2014 Policy, pursuant to which Montgomery terminated Plaintiff's employment, provides for progressive disciplinary action as Hostetler indicated, but allows for more immediate action "where behavior or employee problems are too severe for progressive disciplinary action . . ." [Dkt. 30-1 at 52].  The 2013 Policy, which Hostetler indicates "was still relied upon in 2014 for a more detailed explanation of [this] procedure," *id.* at 4, provides in relevant part as follows:

> Decisions about appropriate disciplinary action are based on the nature and circumstances of the offense. Each situation is evaluated on an individual basis, with each case considered on its own merits. Supervisors will deal with each unrelated problem separately, unless it is determined that a pattern of unsatisfactory behavior or performance exists. In such cases, problems will be addressed as a group instead of individually. . . .

*Id.* at 67.

demonstrates Defendants' pretext for terminating him.  *Id.*   On August 30, 2016, Defendants filed their Motion to Strike Plaintiff's Response and Brief in Opposition to Defendants' Motion for Summary Judgment, requesting that the Court strike portions (or all) of Plaintiff's Response [Dkt. 32].  On October 11, 2016, Defendants filed their Reply to Plaintiff's Motion for Summary Judgment with Brief in Support ("Reply") [Dkt. 43], their Objections to Plaintiff's Response to Defendants' Motion for Summary Judgment ("Objections") [Dkt. 44], and their Motion to Strike [Dkt. 45].  Plaintiff responded to the Motion to Strike on October 18, 2016 [Dkt. 47] and to the Objections on December 4, 2016 [Dkt. 61].

The Court held a hearing on October 21, 2016 ("Hearing"), at which the Court addressed Defendants' pending Motion to Dismiss[6] and granted in part Defendants' Motion to Strike Plaintiff's Response and Brief in Opposition to Defendants' Motion for Summary Judgment [Dkt. 32], ordering that Exhibit 1 to Plaintiff's Response be stricken.  The Court thereafter permitted the Parties supplemental briefing to Defendants' Motion for Summary Judgment. Subsequently, on November 2, 2016, Defendants filed their Supplement to Defendants' Motion for Summary Judgment with Brief in Support [Dkt. 52], and Plaintiff filed his Supplemental Briefing Opposing Summary Judgment [Dkt. 53].  On November 9, 2016, Defendants filed their Reply to Daniel's [sic] Supplemental Briefing Opposing Summary Judgment [Dkt. 54], and Plaintiff filed his Response to Supplemental Briefing on Summary Judgment [Dkt. 55]. Defendants thereafter sought, and were granted, leave to file their Sur-Reply to Daniels'

---

[6] The Court outlines the procedural history of Defendants' Motions to Dismiss in an earlier order [Dkt. 59]. Notably, the Court granted in part and denied in part Defendants' requests, finding "Plaintiff's claims under Title VII and/or the ADA relating to incidents that predate July 19, 2014" were time-barred, and that Defendants could not assert Eleventh Amendment immunity to bar Plaintiff's ADA and Section 504 claims against Bass and TxDOT, respectively.  *Id.*  The Court also noted that "Plaintiff dropped any Section 1981 claims[,]" *id.* at 2, and that Plaintiff had "dropped his ADA failure to accommodate and retaliation claims," *id.* at 6 n.5.

Response to Supplemental Briefing on Summary Judgment on November 14, 2016 [Dkts. 56-57].[7]

## OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE

Defendant and Plaintiff each proffer substantial evidence relating to the Motion for Summary Judgment.  Defendant objects to the bulk of Plaintiff's evidence [Dkt. 44] including Plaintiff's alleged "sham" affidavit.  Defendant asks the Court to strike the "sham" affidavit from the record [Dkt. 45].  The Court considers first the distinct issues raised by the alleged "sham" affidavit, and then turns to the Motion for Summary Judgment, considering Defendant's remaining evidentiary objections in the context of the Parties' broader dispute and as needed in its summary judgment analysis.

### I.    *Evidentiary Standard*

Rule 56(c)(2) provides that "part[ies] may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).  The Federal Rules of Evidence provide the appropriate framework for raising (and evaluating) objections to summary judgment evidence.  *Harrison v. Formosa Plastics Corp. Tex.*, 776 F. Supp. 2d 433, 441 (S.D. Tex. 2011) (analyzing hearsay objection to summary judgment evidence under Fed. R. Evid. 801(d)(2)(D) standard); *see also Guarantee Trust Life Ins. Co. v. Wood*, 631 F. Supp. 15, 22 (N.D. Ga. 1984) (finding that an affiant's "opinion would be admissible at trial under Fed. R. Evid. 701 and 702" and that "[t]he issue of admissibility of the affidavit is an evidentiary question, procedural by nature, that is governed by

---

[7] Defendants also requested a hearing on Defendants' Objections, Defendants' Reply to Daniel's [sic] Supplemental Briefing Opposing Summary Judgment [Dkt. 54], and Defendants' Sur-Reply to Daniels' Response to Supplemental Briefing on Summary Judgment [Dkt. 57].  Plaintiff opposes the Court's granting Defendants leave to file a Supplemental Sur-Reply or a hearing [Dkt. 58].  The Court **GRANTS** Defendants' Motion for Leave to File Sur-Reply and **DENIES** Defendants' Request for hearing [Dkt. 56].  Accordingly, Defendants' Sur-Reply to Daniels' Response to Supplemental Briefing on Summary Judgment [Dkt. 57] is deemed filed.

federal, rather than state law").   Given that courts may strike or disregard only objectionable portions of the summary judgment record, parties should object specifically to those portions that purportedly run afoul of evidentiary rules. *See Akin v. Q-L Invs., Inc.*, 959 F.2d 521, 531 (5th Cir. 1992) ("On a motion for summary judgment, the district court should disregard only those portions of an affidavit that are inadequate and consider the rest."); *see also* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2738 (4th ed. 2016) ("It follows that a motion to strike should specify the objectionable portions of the affidavit and the grounds for each objections. A motion asserting only a general challenge to an affidavit will be ineffective.").

In particular, Rule 56 requires that affidavits or declarations used to support (or oppose) a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P.  56(c)(4).   Generally, courts consider these requirements compulsory.  *See, e.g.*, *Oglesby v. Terminal Transp. Co., Inc.*, 543 F.2d 1111, 1112 (5th Cir. 1976) ("Fed.R.Civ.P. 56(c) & (e) make it plain that neither an offer to prove suspicions at trial nor unsworn responsive statements suffice to create disputed issues of material fact which justify a trial. Oglesby never suggested that reasons existed which made a proper affidavit response impossible."); *United States v. Hangar One, Inc.*, 563 F.2d 1155, 1157 (5th Cir. 1977) (finding that the Rule 56 competency requirement applies to the affidavit, itself, not the statements contained within).   Indeed, courts reject summary judgment affidavits that "set forth 'ultimate or conclusory facts and conclusions of law[,]'" *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985), namely those that fail to provide "'specific facts showing a genuine issue for trial[,]'" rather than "'[c]onclusional allegations and . . . unsubstantiated assertions,'"

*Edwards Family P'ship, L.P. v. Dickson*, 821 F.3d 614, 619 (5th Cir. 2016) (quoting *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)).  *See also Travelers Ins. Co. v. Liljeberge Enters., Inc.*, 7 F.3d 1203, 1206-07 (5th Cir. 1993) (applying requirement to non-movant's proffered evidence).  Nevertheless, "the papers of a party opposing summary judgment are usually held to a less exacting standard than those of the moving party."  *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 80 (5th Cir. 1987) ("In previous cases we have accepted evidence from the party opposing summary judgment despite its failure to meet the technical requirements of rule 56(e)."); *see also Jackson v. Mississippi*, 644 F.2d 1142, 1144 (5th Cir. 1981) ("Summary judgment is not, however, an automatic sanction for non-compliance with Rule 56(e). A movant must establish the propriety of relief by the strengths of his own showing, not by the defects in his opponent's showing.").  But where "an affidavit or declaration under [Rule 56] is submitted in bad faith or solely for delay," a court may levy certain sanctions on the offending party.  FED. R. CIV. P. 56(h).

## II.    *Plaintiff's "Sham" Affidavit*

Defendants assert the Court should strike the "Daniels Sworn Statement" (at Dkt. 31-2) (hereinafter "Plaintiff's Affidavit") under the sham-affidavit rule [Dkt. 45].  Defendants point to three discrepancies between Plaintiff's Affidavit and Plaintiff's prior deposition testimony in support of their position that Plaintiff's Affidavit constitutes a sham affidavit.  *Id.* at 2-4.  Meanwhile, Plaintiff contends Defendants misapply the sham affidavit rule, construing it too strictly and arguing, in any event, that none of the three purported discrepancies establishes that Plaintiff's Affidavit constitutes a sham under the rule [Dkt. 47].   In this instance, the Court largely agrees with Plaintiff.

Consider in *Doe ex rel. Doe v. Dallas Independent School District*, the Fifth Circuit upheld a district court's ruling that a plaintiff had failed to create a genuine issue of material fact in producing an affidavit that directly contradicted the plaintiff's earlier deposition testimony. 220 F.3d 380, 385-87 (2000).   The plaintiff-appellant asserted he had provided his school principal with actual notice that he (the plaintiff) had been sexually molested by a teacher.  *Id.* at 385.   The district court, considering the plaintiff's 1988 affidavit stating the plaintiff had provided actual notice to the principal, the plaintiff's 1996 "unequivocal" testimony to the contrary, and the plaintiff's 1999 affidavit asserting the accuracy of the 1988 affidavit, decided to discount the "1999 affidavit as a subsequent affidavit contradicting prior testimony without explanation."  *Id.* at 383.  The Fifth Circuit observed that the plaintiff did not allege he "was not represented by counsel at the 1996 deposition" and that his "testimony was unequivocal" on the actual notice issue, though he had "responded to certain [other] questions by stating that he could not answer because he did not recall what had happened."  *Id.* at 386.  In light of these facts, and in keeping with the "holding that a plaintiff may not manufacture a genuine issue of material fact by submitting an affidavit that impeaches prior testimony without explanation[,]" the *Doe* Court determined that the district court had duly disregarded the 1999 affidavit as a sham. *Id.* at 386-87.

Critically, the Fifth Circuit noted in *Doe* that "courts should scrutinize conflicts between affidavit and deposition testimony and only grant summary judgment when those conflicts raise . . . sham issues."  *Id.* at 386 (examining *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365-66 (8th Cir. 1983)).  The Fifth Circuit's inquiry thus sought to preserve "'the utility of summary judgment as a procedure for screening out sham issues of fact[,]'" not to prescribe a rigid rule for rejecting any inconsistent testimony or averments.  *Id.* (quoting *Perma Res. & Dev.*

*Co. v. Singer Co.*, 410 F.2d 572, 278 (2d Cir. 1969)); *see also Dibidale of La., Inc. v. Am. Bank & Trust Co., New Orleans*, 916 F.2d 300, 307-08 (5th Cir. 1990), *amended and reinstated on reh'g*, 941 F.2d 308 (5th Cir. 1991) ("In reviewing a motion for summary judgment the court must consider all of the evidence before it, including affidavits that conflict with deposition testimony. A genuine issue of material fact may be raised by such an affidavit even if it conflicts with earlier testimony in the party's deposition." (internal quotations omitted)).  Indeed, courts both before and after *Doe* have held that inconsistencies between prior and subsequent testimony (or between different witnesses' testimony) do not necessarily indicate a sham, particularly where the inconsistency implicates the affiant/deponent's credibility.  *See, e.g.*, *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 806-07 (E.D. La. 2011) ("Even if the sham affidavit doctrine were applicable, the inconsistencies between [the] deposition testimony and [the] affidavit would not justify striking the affidavit. Not every discrepancy between an affidavit and prior deposition testimony indicates a sham." (internal quotations omitted)); *Lopez Hernandez v. Fincher*, No. Civ.A. 3:04-CV-1084-G, 2005 WL 265214, at *10 (N.D. Tex. Feb. 2, 2005) ("While any inconsistency may affect the weight given the testimony by the factfinder, it is not grounds for striking the testimony. It is not unusual for multiple witnesses' recollection of a single event to vary somewhat."); *Dibidale*, 916 F.2d at 307-08 ("To the extent they exist, discrepancies in [earlier and later] averments present credibility issues properly put to the trier-of-fact. . . . Credibility assessments are not fit grist for the summary judgment mill." (citing *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980))).

Here, Defendants identify three purported discrepancies between Plaintiff's deposition (taken July 7, 2016) and Plaintiff's Affidavit (made August 26, 2016) that, Defendants contend, merit striking Plaintiff's Affidavit [Dkt. 45].  The purported discrepancies are as follows:

|   | Plaintiff's Deposition [Dkt. 45, Ex. A] | Daniels Sworn Statement [Dkt. 45, Ex. B] |
|---|---|---|
| **1** | Q: Okay.  Who was using that – who was using those terms?   And I guess I'll be specific.  Who was using the term "boy" as a racial epithet in your hearing? <br> A: John Grissom. <br> Q: Anybody else? <br> A: As far as my knowledge, I know there's more incidents, but I can't recall at the time. <br> [Ex. A at 159:5-12]. | 6.  Grissom, Shearin, and Lawson would call me "boy" or "boo" without any indication in their voice, their facial expressions, or their tone of voice that they were joking. . . . <br> [Ex. B at 2]. |
| **2** | Q: All right. And, again, just looking at number 37, who in your hearing at the Sherman yard used the word "nigger"? <br> A: Except for Tyson told that, you know, they use it out there in engineering. <br> Q: Okay, did you ever hear that used in your presence? <br> A: Not in my presence, no. <br> [Ex. A at 159:13-20]. | [10.a.]  To Kaitlin (and later Mike): I told them that I was being discriminated against by being assigned worse jobs compared to the white co-workers, I was being called derogatory names like 'boo,' 'boy' and 'Nigger.' <br> 31.   In January 2001, I overheard Frank Shearin saying that if he got a promotion he would "get rid of the niggers."  Given that I was the only African American working at the Sherman Yard at the time, it was clear that Shearin was referring to me directly. Shearin was speaking to John Ward and Jimmy Brayer when he called me a "nigger" . . . <br> [Ex. B at 3, 8]. |
| **3** | Q: Okay.  And any other tasks you can think of that bending was a problem? <br> A: Not at this moment. <br> Q: Okay.   Has the difficulty bending affected you outside of work? <br> A: It's the same at work and outside of work. <br> Q: Okay.   How is it affecting your life outside of work? <br> A: Well, just doing – just mowing the yard and different tasks around the house, you know, walking a long distance.  Just doing, you know, everyday tasks, you know, around the home is the same way. <br> Q: What sort of household tasks is it interfering with? <br> A: Excuse me.  What? <br> Q: Sure.   What household tasks is your | 26.   As a result of the blockages in my arteries in my legs, I had a surgery in October 2012.  Since then, I continue to have trouble bending, lifting, climbing, walking, and engaging in sustained exertion of any of these activities without becoming in pain or excessively tired. <br> [Ex. B at 7]. |

| | |
|---|---|
| bending a problem in?<br>A: Well, just like mowing the yard, I mentioned.  And you've got to weed-eat.  You know, just constantly I bend over.  And just – a lot of times just picking trash up where people done…<br>Q: Any other impact to your normal everyday activities?<br>A: It – best – right now I can't – you know, to the best of my knowledge, I can't think of anymore, you know, at this time.<br>[Ex. A at 111:11-112:11]. | |

Defendants assert with regard to each of these purported discrepancies that "[c]learly Plaintiff's affidavit contradicts his earlier deposition" [Dkt. 45 at 2-4].  Defendants argue that the first discrepancy arises because "Plaintiff changes . . . from saying that only John Grissom would call him 'boy' to . . . saying [in Plaintiff's Affidavit] that Shearin and Lawson would call him that name or 'boo.'"  *Id.* at 2.  Plaintiff counters that, at deposition, Plaintiff only said that he could not recall other specific instances of the use of racial epithets, but that he knew that there were others [Dkt. 47 at 4].  Likewise, Defendant urges that the third discrepancy arises because "Plaintiff changes . . . his deposition testimony from saying that he had trouble bending and walking long distances for mowing and weed eating to . . . saying [in Plaintiff's Affidavit] that he has trouble bending, lifting, climbing walking, and engaging in sustained exertion of any of these activities" [Dkt. 45 at 4].  Plaintiff responds that, at deposition, he qualified his answers to Defendants' questions about his alleged disability by repeatedly saying he could not elaborate specifically on his limitations at the moment [Dkt. 47 at 5].  Plaintiff adds that his elaboration in Plaintiff's Affidavit does not contradict but merely "augments or completes" his earlier deposition testimony.  *Id.* at 6.

The Court agrees with Plaintiff regarding the first and third purported discrepancies.  In each of these situations, Plaintiff answered Defendants' inquiry at deposition with certain details

but noted other information existed that he could not recall at the time.  Unlike in *Doe*, Plaintiff did not affirmatively state one thing at deposition then the exact opposite in Plaintiff's Affidavit, *see* 220 F.3d at 385-87; rather, Plaintiff provided additional details that are consistent with his prior deposition testimony, *cf. Affidavit*, Black's Law Dictionary (10th ed. 2014) (A "sham affidavit [is one] that contradicts clear testimony given by the same witness[.] . . ."). The Court finds that neither the first nor third purported discrepancies present any clear inconsistency that would merit granting Defendants' Motion to Strike.

Defendants argue additionally that "Plaintiff changes his deposition testimony from saying that no one said the n-word in his presence to saying [in Plaintiff's Affidavit] that he overheard Shearin call him the n-word in the Sherman Yard[,]" giving rise to the second purported discrepancy [Dkt. 45 at 3]. Plaintiff asserts his testimony at deposition that Shearin used the term "nigger" outside of Plaintiff's presence is not inconsistent with Plaintiff's later representation in Plaintiff's Affidavit that he overheard Shearin use that term [Dkt. 47 at 5]. In any event, Plaintiff argues, this purported inconsistency does not raise a "new issue of fact" because Defendants' "own business records establish that [Plaintiff] heard and reported to TxDOT that he had been referred to as a 'nigger' in the workplace." *Id.*

The Court agrees with Defendants that Plaintiff's representation in Plaintiff's Affidavit presents an inconsistency. Defendants' counsel first asked Plaintiff "who in your hearing at the Sherman Yard used the word 'nigger'?", to which Plaintiff responded, "Except for Tyson told that, you know, they use it out there in engineering" [Dkt. 45-1 at 129:14-17]. Further, when asked "Did you ever hear that [term] used in your presence?", Plaintiff replied "Not in my presence, no." *Id.* at 129:18-20. Unlike the purported discrepancies discussed *supra*, here Plaintiff neither equivocated nor answered that he could not recall: he answered the questions

directly and in the negative.   Nevertheless, "[n]ot every discrepancy between an affidavit and prior deposition testimony indicates a sham." *Wagoner*, 813 F. Supp. 2d at 806-07.   In light of Defendants' own business records (submitted by Plaintiff as summary judgment evidence),[8] which corroborate Plaintiff's Affidavit by demonstrating that other employees had heard (and reported) the word "nigger" had been in the Sherman Yard, this discrepancy amounts to nothing more than a credibility issue on Plaintiff's part. *See Lopez Hernandez*, 2005 WL 265214, at *10; *Dibidale*, 916 F.2d at 307-08.   The Court finds that the second discrepancy provides no support for striking entirety of Plaintiff's Affidavit.   In light of the foregoing, the Court **DENIES** Defendants' Motion to Strike Plaintiff's Affidavit as "Sham Affidavit" [Dkt. 45].

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).   Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).   A dispute about a material fact is genuine

---

[8] Plaintiff cites Dkt. 31-10 at 6-21, to show that Plaintiff's Affidavit is otherwise supported by the record in this regard.   Defendants present two objections to these records: (1) the statements therein are unsworn and unverified and, therefore, constitute inadmissible hearsay, and (2) the allegations contained therein are time-barred [Dkt. 44 at 9].   Plaintiff responds that Defendants "produced [these records] in discovery" and that the records constitute business records excepted from the rule against hearsay [Dkt. 61 at 5].   The records contain an assortment of handwritten and typed witness statements from January 2001 concerning Shearin's use of the word "nigger" while at work [*see* Dkt. 31-10 at 6-21].   Affixed at the bottom of each page is the tag "DANIELS-TXDOT" with six-digit number following.   *Id.*   Preceding the cited pages is a TxDOT Human Resources Memorandum dated February 1, 2001, that also is affixed with the aforementioned tag and which reflects that the pages complained of were attachments to the TxDOT-generated memo.   *Id.* at 2.

Whether or not these records constitute business records under Rule 801(d), they qualify as admissions of a party opponent under the same rule.   *See BP Expl. & Prod., Inc. v. Cashman Equip. Corp.*, No. Civ.A. H-13-3046, 2016 WL 1387907, at *16 (S.D. Tex. Apr. 8, 2016) ("[T]he documents challenged by Defendants that were produced in response to discovery requests, such as the emails, are admissible as admissions of a party opponent and/or as business records under the Rule 801(d)[.] . . ."). Under Federal Rule of Evidence 801(d), then, these statements are "not hearsay."   *See also* FED. R. EVID. 805 (regarding multiple hearsay).   Moreover, Courts consider evidence or statements in an affidavit tied to a barred or unpursued claim where that evidence is relevant, as such evidence "may still constitute relevant background evidence in proceeding[s] in which the . . . practice is at issue[.]" *Rutherford*, 197 F.3d at 186 (citing *Evans*, 431 U.S. at 558).   Accordingly, the Court overrules Defendants' objections to Dkt. 31-10.

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson,* 477 U.S. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News*, *Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248-49). The nonmovant must adduce affirmative evidence. *Anderson*, 477 U.S. at 257. The Court need only consider the record materials actually cited by the parties, though the Court may consider the entire record. FED. R. CIV. P. 56(c)(3).

## ANALYSIS

Defendants argue in their Motion for Summary Judgment that Plaintiff's claims should be dismissed because (1) Plaintiff cannot establish a *prima facie* case of race discrimination or retaliation under Title VII, (2) Plaintiff cannot establish a *prima facie* case of disability

discrimination under the ADA and Section 504, and (3) Plaintiff cannot demonstrate Defendants'

proffered reasons for termination amount to pretext [Dkt. 30].   The Court considers these

arguments and Plaintiff's responses in turn.[9]

### A.    *Plaintiff's Title VII Discrimination Claim*

Plaintiff alleges that Defendants discriminated against him on the basis of race in

violation of Title VII when they terminated his employment.   Title VII prohibits employers from

"discharg[ing] an individual, or otherwise discriminat[ing] against any individual . . . because of

such individual's race, . . . or national origin."   42 U.S.C. § 2000e-2(a)(1).   The Title VII inquiry

asks "whether the defendant intentionally discriminated against the plaintiff[,]" and the plaintiff

may evidence such intent directly or circumstantially.   *Alvarado v. Tex. Rangers*, 492 F.3d 605,

611 (5th Cir. 2007).   Where a plaintiff relies only on circumstantial evidence of discrimination,

the "claim is analyzed using the framework set forth in *McDonnell Douglas*."   *Id.*   The Fifth

Circuit has outlined that framework as follows:

> [A] plaintiff must first create a presumption of intentional discrimination by
> establishing a prima facie case. . . . The burden then shifts to the employer to
> articulate a legitimate, nondiscriminatory reason for its actions. *Reeves v.
> Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147
> L.Ed.2d 105 (2000); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–
> 56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The burden on the employer at this
> stage "is one of production, not persuasion; it 'can involve no credibility
> assessment.'" *Reeves*, 530 U.S. at 142, . . . . If the employer sustains its burden,
> the prima facie case is dissolved, and the burden shifts back to the plaintiff to
> establish either: (1) that the employer's proffered reason is not true but is instead a
> pretext for discrimination; or (2) that the employer's reason, while true, is not the
> only reason for its conduct, and another "motivating factor" is the plaintiff's
> protected characteristic.

---

[9] The Court notes that, for each of Plaintiff's Title VII and ADA claims considered here, the Parties concur that the burden-shifting framework established in the U.S. Supreme Court's *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), decision applies. *See Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001) (*McDonnell Douglas* applies in Title VII retaliation cases); *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (likewise in ADA cases).

*Id.* (citations omitted).   Thus, to survive summary judgment under *McDonnell Douglas*, Plaintiff must first present evidence supporting a *prima facie* case of discrimination.   A plaintiff's *prima facie* Title VII discrimination case comprises of four elements: (1) membership in a protected class, (2) qualification for the job at issue, (3) subjected to an adverse employment action, and (4) treatment less favorable than similarly situated employees not members of the protected class under nearly identical circumstances.   *Lee v. Kan. City S. Ry.*, 574 F.3d 253, 259 (5th Cir. 2009). Importantly, "[t]o establish a *prima facie* case, a plaintiff need only make a very minimal showing."   *Brooks v. Firestone Polymers, LLC*, 70 F. Supp. 3d 816, 831 (E.D. Tex. 2014), *aff'd sub nom. Brooks v. Firestone Polymers, L.L.C.*, 640 F. App'x 393 (5th Cir. 2016) (quoting *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996)).

### 1.   *Plaintiff's* **prima facie** *race discrimination case*

In the present case, Defendants argue that Plaintiff's race discrimination claims cannot survive summary judgment because Plaintiff does not provide evidence of the fourth element of the *prima facie* case.   Specifically, Defendants assert Plaintiff can point to no comparator—a similarly situated, non-African American employee terminated under nearly identical circumstances—in support of his discrimination claim [Dkts. 30 at 4-6; 43 at 2-6; 52 at 3-5; 57].[10]   Plaintiff responds by proffering five TxDOT employee profiles and asserting each

---

[10] Defendants also introduce Duane Compton ("Compton") as a potential comparator of Plaintiff and then provide reasons why Compton does not qualify as a valid comparator [Dkt. 52].   Plaintiff does not address Compton, except to say that "Compton's termination was based on a distinct policy related to preventable accidents which explicitly contemplate termination for multiple events within a defined period of multiple years" [Dkt. 55 at 3].   Plaintiff alleges through this statement—and cites record evidence to support the assertion—that Compton does not constitute a valid comparator here.   *See Smith v. Wal-Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir. 1990) (finding employees not similarly situated where their conduct involved breaches of different company policies). Accordingly, the Court considers Compton no further.

constitutes a "comparator" sufficient to carry Plaintiff's burden of proving a *prima facie* case of race discrimination under Title VII [Dkt. 31at 15-19].[11]

In order for a claimant's proffered comparator to meet the "similarly situated" requirement, the employer must have treated the comparator more favorably than the claimant under "nearly identical circumstances." *Lee*, 574 F.3d at 259-61.  Generally, employees that "held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories" will be found to experience employment actions under nearly identical circumstances.  *Id.* at 260 (citations omitted).  On the other hand, employees with "different supervisors, who work for different divisions of the company or who were the subject of adverse employment actions too remote in time from that taken against the [claimant]" or "who have different work responsibilities" do not experience employment actions under nearly identical circumstances.  *Id.* at 259-60.  Additionally, the claimant must show "the conduct that drew the adverse employment decision [was] 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Id.* at 260.  In other words, "[i]f the 'difference between the [claimant's] conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer,' the employees are not similarly situated for the purposes of an employment discrimination analysis." *Id.* (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001) (emphasis added)).

_____

[11] Plaintiff also asserts that, "absent evidence that any comparator employees were also subjected to false allegations to support disciplinary actions against them, the similarly situated (nearly identical) analysis has therefore been satisfied, since it can be shown that no comparator suffered a similar adverse action under similar circumstances" [Dkt. 31 at 10-11].  This argument flips the *McDonnell Douglas* burden on its head: it is Plaintiff's burden to prove that a comparator exists and was treated more favorably than Plaintiff, not Defendant's burden to show that no comparator was not treated similarly.  *See, e.g.*, *Lee*, 574 F.3d at 259-62 (indicating that "validly identifying . . . a comparator" is a plaintiff's burden).  Accordingly, the Court evaluates *infra* whether Plaintiff carries his burden of demonstrating that a similarly situated, non-African American TxDOT employee was treated more favorably than Plaintiff under nearly identical circumstances.

This does not, however, mean complete identity is required under the law.  Indeed Fifth Circuit precedent makes clear the law requires *near* identity, not complete identity, between the claimant and proffered comparator(s).  *Id.* at 260-61 (Courts consider whether "the ultimate decisionmaker as to employees' continued employment is the same individual," not necessarily whether the employees share an immediate supervisor.).  The Court must look to the broader employment context, particularly as it relates to employees' respective disciplinary histories.  *Id.* at 261.  The Fifth Circuit has noted:

> Each employee's track record at the company need not comprise the identical number of identical infractions, albeit these records must be comparable. As the Supreme Court has instructed, the similitude of employee violations may turn on the 'comparable seriousness' of the offenses for which discipline was meted out and not necessarily on how a company codes an infraction under its rules and regulations.

*Id.*

Courts weigh the factors outlined above as applicable to determine whether the claimant and its proffered comparators are "similarly situated" as a matter of law.  *See, e.g.*, *id.* at 261-62 (finding two train engineers similarly situated where each had received a 5- and 30-day suspension over the same period preceding termination and were each terminated for similar moving violations); *Turner v. Kan. City S. Ry.*, 675 F.3d 887, 895-98 (5th Cir. 2012) (finding a train engineer and conductor similarly situated where each had similar "responsibilities during the . . . incident [at issue,]" the incident at issue was comparably serious to the incident for which the comparator employee was placed on suspension—rather than terminated—and the plaintiff and comparator had sufficiently similar disciplinary histories); *Glaskox v. Harris Cty., Tex.*, 537 F. App'x 525, 530 (5th Cir. 2013) (finding disciplinary histories incomparable where one offense was precisely the same but comparator resigned before investigation into violation, and other incident did not constitute a violation that would even be subject to punishment); *Wheeler v. BL*

*Dev. Corp.*, 415 F.3d 399, 406 (5th Cir. 2005) (finding employees who each stole company property not similarly situated where plaintiff stole a vastly more expensive item from the company than the proffered comparator, and the comparator was forthcoming during the company's investigations while the plaintiff was "less than truthful" during the same); *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 305 (5th Cir. 2000) (noting "striking differences" including different jobs, different disciplinarians, and more favorable treatment for plaintiff than comparator and finding the circumstances surrounding the adverse action in issue "fell short of 'nearly identical'"); *Smith v. Wal-Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir. 1990) (finding two employees not similarly situated where their conduct "in no way involved a breach" of the same company policy). Courts consider whether "comparator employees were similarly situated from the perspective of their employer at the time of the relevant employment decisions." *Perez v. Tex. Dep't of Crim. Justice, Institutional Div.*, 395 F.3d 206, 210 (5th Cir. 2004).

Again, Plaintiff proffers five coworkers as comparators: Tommy Langford ("Langford"), Frank Shearin ("Shearin"), Steve Hughes ("Hughes"), John Ward ("Ward"), and Mike Faulks ("Faulks") [Dkt. 31 at 15-19]. Defendant asserts none of these persons constitutes a valid comparator [Dkts. 30 (preemptively addressing Shearin); 43 (addressing all five comparators); 52 (same)]. The Court first reiterates Plaintiff's relevant characteristics, then considers each proffered comparator in turn.

### a.     *Plaintiff*

Plaintiff is an African American male who, during the relevant time period, worked as a "General Transportation Tech III"—a "Maintenance Worker . . . in a non-supervisory position"—in TxDOT's "Grayson County Maintenance Office, located in the Sherman Area

Maintenance Office in Sherman[, Texas]" (the "Sherman Yard") [Dkt. 30-1 at 2-3].  Also during

the relevant time period, Grissom served as Plaintiff's immediate supervisor, and Montgomery

was responsible for all ultimate personnel decisions regarding employees at the Sherman Yard.

*Id.* at 3.   At the time Montgomery terminated Plaintiff's employment, Plaintiff's disciplinary

history as documented in the record included the following:

> (1) A "Written Reprimand" for "inappropriate" behavior relating to a verbal altercation
> between Plaintiff and another employee on September 2, 2010, letter dated
> September 23, 2010 [Dkt. 30-1 at 12];
> (2) A twelve-month probation for "inappropriate" behavior relating to insubordinate
> comments to a crew leader on September 20, 2011, *id.* at 27;
> (3) A warning for "sitting in [a vehicle] on the passenger side while the others did their
> assigned duties" on April 7, 2014, *id.* at 34;
> (4) An "oral warning" for arguing with Grissom regarding his work assignment on
> May 21, 2014, *id.* at 34;
> (5) A negative mid-cycle review in 2014, *id.* at 36.
> (6) A "written reprimand" for overstating hours Plaintiff attended a training on
> March 25, 2002 [Dkt. 43-1 at 9].

The first, second, fourth, and fifth disciplinary records formed the foundation of

Montgomery's decision to terminate Plaintiff's employment, according to Montgomery's letter

terminating Plaintiff [Dkt. 30-2 at 7-8].  Hostetler's report references all of the records except the

sixth, which Defendants introduced in the Supplemental Motion for Summary Judgment [*see*

Dkt. 43-1 at 9].  Hostetler's report as reflected in the record also omits reference to Grissom's

positive performance reviews of Plaintiff from 2012 to early 2014 [Dkt. 31-11 at 9-24].[12]

---

[12] Plaintiff argues compellingly that, although "TxDOT's policy manual does not on its face restrict the length of
time that a disciplinary action may be used to support a progressive disciplinary enhancement[,] . . . [the] policy is
actually silent on [the] issue of the age/applicability of a disciplinary action . . ." [Dkt. 31 at 20].  As excerpted at
*supra* note 5, the 2013 Policy arguably provides for progressive disciplinary procedures only where "a pattern of
unsatisfactory behavior or performance exists."   [Dkt. 30-1 at 67].   In light of Grissom's consistently positive
performance and conduct reviews of Plaintiff from 2012 to early 2014 [Dkt. 31, Ex. 11 at 9-24], and the 2014
Policy's method of "us[ing] increasingly more severe actions *to coach employees who are not meeting Department
expectations*[,]" a reasonable juror could conclude that Plaintiff's disciplinary history prior to Grissom's positive
reviews has no bearing on whether Plaintiff should or should not have been terminated.  *Anderson*, 477 U.S. at 248.
The Court considers this question more fully *infra* in its discussion of pretext.

### b.      Langford

Langford's Sworn Statement reveals that Langford is a white male who worked with Plaintiff in the Sherman Yard from 1996 until Langford's retirement in September 2014 [Dkt. 31-12 at 15].   Langford avers that, sometime late in 2013 or early 2014, he and Grissom got into "an argument that included both of [them] yelling at each other."   *Id.*   Langford admits that his "communication with . . . Grissom was very disrespectful" but that he "never received any disciplinary action or counseling about [his] interaction with . . . Grissom that day."   *Id.* Defendant argues, through the Affidavit of Hostetler, that Langford's "personnel file contains no previous conduct related disciplinary history[,]" which prevents Langford from being a valid comparator [Dkt. 43-1 at 3].   The Court agrees.   Although the July 23, 2014 Incident (between Plaintiff and Grissom) and the incident described in Langford's Sworn Statement are similar, Plaintiff, who has an underlying disciplinary history of record—six violations—over a similar time period, is not comparable to Langford, who has no such previous conduct-related violations. *See Lee*, 574 F.3d at 261-62 (indicating similarly situated employees are those who have a similar amount and type of disciplinary records).

### c.      Shearin

According to Plaintiff's Affidavit, Shearin is also a white male who worked with Plaintiff in the Sherman Yard [Dkt. 30-2 at 4-5].   Plaintiff avers that Shearin at least twice yelled at Traylor, once "[i]mmediately after the morning meeting, . . . in front of most of the maintenance workers in the mechanic shop" and once more "in Traylor's office[.]"   *Id.* at 5.   Traylor has testified to the contrary that Shearin never "confronted [him] in front of a group of people" and that Shearin only ever confronted him once [Dkt. 30-4 at 31:3-11].   Even taking Plaintiff's version as true, and assuming these incidents are similar to the July 23, 2014 Incident, Plaintiff

still must show comparable disciplinary histories.   Shearin's most recent "conduct related disciplinary actions were a written warning and twelve-month probation issued in February 2001[,]" well over fifteen years ago [Dkt. 43-1 at 3].   Plaintiff's disciplinary history is not comparable to Shearin's: Plaintiff has at least two more conduct-related violations, and the allegations relied upon to terminate him are significantly more recent [Dkt. 43-1 at 3].   *See Lee*, 574 F.3d at 259 (indicating similarly situated employees are those who have a similar amount and type of disciplinary records); *Turner*, 675 F.3d at 895-98 (same).   The Court accordingly finds that Shearin is not a valid comparator.

### d.      *Hughes*

Turning next to Hughes, Plaintiff avers Hughes is a white male who worked with Plaintiff in the Sherman Yard in Maintenance [Dkts. 31-2 at 4, 43-1 at 3].   Plaintiff's Affidavit indicates he heard Nance assign Hughes to a task during the winter of 2013-2014, which Hughes refused to perform because he lacked the proper equipment [Dkt. 31-2 at 6].   Plaintiff avers that "there was no time that day that Hughes was called into the office or disciplined" for failing to follow Nance's instruction.   *Id.*   Nance's deposition testimony corroborates Plaintiff's Affidavit regarding both Hughes's reaction and TxDOT's failure to discipline Hughes in response [Dkt. 31-4 at 60:13-64:11].   Hostetler averred that Hughes's "personnel file indicates he had no conduct related disciplinary history prior to July 2014, when he received an oral counseling [for speaking disrespectfully to another employee]" [Dkt. 43-1 at 3, 16-17].

Hughes's conduct in question (during the winter of 2013-2014) is distinguishable—but only slightly—from Plaintiff's conduct during the July 23, 2014 Incident.   Hughes and Plaintiff were both arguably insubordinate, and each only provided explanation for being unprepared to handle an assigned task—Hughes because he lacked the proper equipment, Plaintiff because he

needed to leave for an appointment—once confronted by their respective supervisors [*compare* Dkts. 31-2 at 6; 31-4 at 60:13-64:11, *with* Dkt. 30-3 at 30:23-31:4].

Moreover, Plaintiff's disciplinary history as considered by Montgomery, particularly when viewed since 2012, includes only one negative mark more than Hughes's [*compare* Dkt. 43-1 at 3, *with* Dkt. 30-2 at 7-8].  Hughes and Plaintiff also each reported to Nance during the time period relevant here and had apparently similar job responsibilities [*see* Dkt. 31-2 at 6]. Defendants argue that Hughes was a "General Transportation Specialist I" while Plaintiff was a "General Transportation Tech III" but do not describe how the responsibilities associated with these positions differ [Dkt. 43-1 at 3].  Lacking additional guidance from Defendants as to the employer's perspective of Hughes's and Plaintiff's respective job responsibilities, the Court finds taking all facts in the light most favorable to Plaintiff that Hughes's and Plaintiff's respective job responsibilities were not so dissimilar to eschew comparison here.  *Cf. Lee*, 574 F.3d at 261 ("[T]he similitude of employee violations may turn on the 'comparable seriousness' of the offenses for which discipline was meted out and *not necessarily on how a company codes an infraction* under its rules and regulations." (emphasis added)).  Accordingly, the Court finds that Plaintiff's and Hughes's respective conduct and disciplinary histories were similarly situated and that Hughes was treated more favorably under nearly identical circumstances.  *See Lee*, 574 F.3d at 261-62; *Turner*, 675 F.3d at 895-98.

### e.     Ward

Ward is a white male who at least once oversaw Plaintiff's work [Dkt. 31-2 at 4, 8]. Hostetler avers that TxDOT employs Ward as a "Transportation Maintenance Crew Chief I" and that his "personnel file indicates he had no previous conduct related disciplinary history prior to . . . oral counseling received April 8, 2014, . . . along with a documented oral warning received

May 21, 2014 [Dkt. 43-1 at 3-4].   Although it appears Ward's and Plaintiff's disciplinary histories are comparable, the Court cannot find that Ward and Plaintiff are similarly situated because the record reveals they had entirely different job responsibilities [*see, e.g.*, *id.* at 19 (noting "Ward and . . . Nance are the acting crew chiefs and are in charge of their assigned crews"); *id.* at 20 (describing Ward's position as "a leadership role"); Dkt. 31-2 at 2 (describing Ward as a "supervisor[] over Maintenance" and Plaintiff as an "employee working in Maintenance").   Accordingly, the Court finds that Ward is not a valid comparator.   *Cf. Wyvill*, 212 F.3d at 305.

### f.    Faulks

According to Plaintiff's Affidavit and the Faulks Sworn Statement, Faulks is a white male who worked with Plaintiff in Maintenance at the Sherman Yard [Dkts. 31-2 at 2, 4; 31-12 at 13].   Plaintiff and Faulks each averred that Plaintiff and Faulks one day were operating Truck-Mounted Attenuators—large vehicles that "serve[] as a traffic signal and crash buffer"—when Grissom arrived at their job site [Dkts. 31-12 at 13; 31-2 at 4].   Each averred, as well, that TxDOT had trained them never to leave the Attenuator unattended while operating the Attenuator for safety purposes at a worksite [Dkts. 31-12 at 13; 31-2 at 4].   Faulks indicated in his statement that Grissom approached Plaintiff and "appeared" to "reprimand[]" him before Plaintiff "began helping out working on the test site by spreading out material with a concrete tool to fill a hole[, which] left the [Attenuator] unattended . . . " [Dkt. 31-12 at 13].   Faulks averred that he "expected Grissom to also come to [him] and tell [him] to get out of the [Attenuator] as well, but [Grissom] never did."   *Id.*

Hostetler averred that Faulks worked as a "General Transportation Tech III" and that "[h]is personnel file contains no previous conduct related disciplinary history" [Dkt. 43-1 at 4].

Although it appears from the record that Grissom treated Faulks more favorably than he treated Plaintiff on the day described above, Plaintiff's disciplinary history is incomparable to Faulks's. *See Lee*, 574 F.3d at 259.  The Court accordingly finds that Faulks is not a valid comparator.

Because the Court finds that Plaintiff proffers at least one valid comparator—Hughes— the Court also finds that Plaintiff satisfies his burden of establishing a *prima facie* case of Title VII race discrimination.  Accordingly, the burden shifts to Defendants to produce evidence of legitimate, nondiscriminatory reasons for having terminated Plaintiff.  *Alvarado*, 492 F.3d at 611.  If Defendants satisfy this burden, Plaintiff must establish these reasons are in reality pretext for Defendants' truly discriminatory motives.  *Id.*

### 2.    *Reasons for termination and allegations of pretext*

An employer bears only the burden of producing legitimate, nondiscriminatory reasons for terminating an employee once an employee creates a presumption of intentional discrimination through establishing a *prima facie* discrimination case.  *See Reeves*, 530 U.S. at 142.  Although the employer may not "have any discriminatory animus against [the employee] in making its decision[,]" the employer may "be incorrect in its assessment of the facts it relies on to justify [its decision.]"  *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011).  The proffered reasons must be "clear and reasonably specific," and the employer may use affidavits to evidence its purported reasons for terminating an employee.  *Ward v. Midwestern State Univ.*, 217 F. App'x 325, 328 (5th Cir. 2007) (per curiam).

By contrast, to demonstrate an employer's proffered reasons constitute mere pretext, an employee "must show that [the employer's] 'proffered explanation is false or "unworthy of credence."'"  *Id.* at 637 (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 479 (5th Cir. 2003)).  An employee may show as much through "oral statement[s] exhibiting discriminatory animus . . .

[where the statements] demonstrate discriminatory animus and . . . [are] made by a person primarily responsible for the adverse employment action or by a person with influence or leverage over the formal decisionmaker." *Laxton*, 333 F.3d at 583 (noting also that, after *Reeves*, the Fifth Circuit's four-part test for using oral statements as evidence of pretext applies only where "a remark is presented as direct evidence of discrimination"); *see also Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 608 n.4 (5th Cir. 2007). "[S]tray derogatory remarks relating to minority status[,]" however, will not suffice to show pretext. *White v. Orange Auto Ctr.*, 101 F. Supp. 2d 485, 491 (E.D. Tex. 2000) ("Thus, a single remark of 'Buckwheat,' and a single allusion to 'Porch Monkey,' over a five-year period, are insufficient to support a racial discrimination claim.") (citing *Boyd v. State Farm Ins. Cos.,* 158 F.3d 326, 329-30 (5th Cir.1998)). Whether a remark "is so stray as to not shed any light on whether the employer made the employment decision based on prohibited discrimination depends on its context": "when uttered randomly and remotely by co-workers[,]" for example, the remark(s) may not suffice. *Id.* On the other hand, when "uttered by a supervisor with ultimate authority over the employment decision at issue and proximately in time to the challenged action[,]" the remark is more probative. *Id.* (citing *Krystek v. Univ. of S. Miss.,* 164 F.3d 251, 256 (5th Cir.1999)).

In this vein, the discriminatory animus of an aggrieved employee's supervisor may be imputed to the ultimate decisionmaker—and, thus, the employer—where the employee can show "the supervisor's influence with the decisionmaker [was] strong enough to actually cause the adverse employment action." *Cf. Zamora v. City of Houston*, 798 F.3d 326, 332 (5th Cir. 2015). In such situation, where the ultimate decisionmaker acts merely as the supervisor's "cat's paw," a court may conclude that the reason proffered in support of the ultimate decision to terminate

constitutes pretext for the supervisor's demonstrated animus.  *Cf. id.* (When "[r]ead together," the U.S. Supreme Court's decisions in *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013), and *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011), "make clear that cat's paw analysis remains viable in the but-for causation context.").  *See generally Staub*, 562 U.S. at 415 n.1 (explaining the cat's paw analogy and its genesis in Title VII law).  An independent investigation into and recitation of the reasons for terminating an employee will not automatically insulate an employer from liability for a purportedly discriminatory termination; rather, courts consider whether an employer's agent—such as the terminated employee's supervisor—"committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment action."  *Staub*, 562 U.S. at 420-21.

In the present case, Defendants point to TxDOT's progressive disciplinary policy, Plaintiff's disciplinary history, and Plaintiff's conduct during the July 23, 2014 Incident as reasons for terminating Plaintiff's employment [Dkts. 30 at 9-13; 30-1 at 55-57].  Defendants assert Montgomery, who made the decision to terminate Plaintiff knew neither of Plaintiff's race, nor of Plaintiff's alleged disability, at the time Montgomery made his decision [Dkts. 43 at 7;30-2 at 3].  Specifically, Defendants proffer the Affidavits of Hostetler [Dkts. 30-1 at 2-6; 43-1 at 2-7], certain of Plaintiff's disciplinary records from 2010-2011 and 2014 [Dkt. 30-1 at 12-42], and Montgomery's Affidavit and termination letter [Dkt. 30-2 at 2-5, 7-9] in support of the decision to terminate Plaintiff.[13]  Defendants' evidence is sufficient meet their burden of producing evidence of legitimate, nondiscriminatory reasons for terminating Plaintiff—his disciplinary history and his alleged outburst during the July 23, 2014 Incident—through the Hostetler

---

[13] Plaintiff does not expressly assert Defendants fail to meet their burden of producing legitimate, nondiscriminatory reasons to rebut Plaintiff's *prima facie* race discrimination case, but instead argues these reasons amount to pretext [*see* Dkt. 31 at 8, 21-24, 30-31].

Affidavits, the Montgomery Affidavit, Plaintiff's employment record, and Montgomery's termination letter.  *See, e.g.*, *Reeves*, 530 U.S. at 142; *Ward*, 217 F. App'x at 328.

Notwithstanding, the Plaintiff raises genuine issues of material fact with regard to whether these reasons constitute pretext.[14]   First, Plaintiff questions the propriety of Montgomery's reliance on disciplinary actions taken against Plaintiff prior to the 2012 to early 2014 period, when Plaintiff received no disciplinary actions and received only positive reviews from his supervisor, Grissom [*see* Dkt. 31 at 19-20].   As the Court indicated *supra* in its comparator discussion, neither the 2013 nor 2014 Policy make clear the role a TxDOT employee's prior disciplinary history should play in later disciplinary actions.   Hostetler avers TxDOT supervisors use the 2013 and 2014 Policies in tandem to determine whether and how to use TxDOT's progressive disciplinary policy, and states that "[u]nder TxDOT policy, disciplinary actions do not expire and repeated offenses of a similar nature will progress an employee further down the disciplinary path" [Dkt. 30-1 at 4].   The proffered policy documents, however, are largely silent as to the expiration date of prior disciplinary actions—if anything, the 2013 and 2014 Policies indicate only that disciplinary actions that illustrate "a pattern of unsatisfactory behavior" [Dkt. 30-1 at 67] and that have failed "to coach employees" into "meeting Department expectations" [Dkt. 30-1 at 52] will operate as a basis for progressing an employee further down the path toward termination.   Given that Plaintiff received only positive reviews from Grissom (and no disciplinary actions) from 2012 to early 2014 [Dkt. 31-11 at 9-24], a reasonable jury could find that the progressive disciplinary action was applied against Plaintiff in this case as pretext.  *See Machinchick v. PB Power, Inc.*, 398 F.3d 345, 354 (5th Cir.

---

[14] The Court reiterates here that, although Plaintiff may raise no claims pertaining to the disciplinary actions Defendants took against him prior to July 19, 2014 [Dkt. 59 at 2], Plaintiff may still rely on evidence of those actions (and the surrounding circumstances) to demonstrate pretext or any other element of his present claims.  *Cf. Rutherford*, 197 F.3d at 186.

ORDER – Page 31

2005) (finding fact issue where employer did not follow its progressive disciplinary policy and had recently complimented the employee on his job performance); *Anderson*, 477 U.S. at 248. In other words, Plaintiff raises a genuine issue of material fact as to whether his aged disciplinary history, as a reason proffered for his termination, is not truly a reason for his termination "but is instead a pretext for discrimination[.] . . ." *Alvarado*, 492 F.3d at 611.

Further, Plaintiff points to alleged gaps in Hostetler's investigation that could lead a reasonable jury to conclude that Montgomery—in relying on Hostetler's investigation—acted as the "cat's paw" for Grissom's and Traylor's purported discriminatory animus [Dkt. 53 at 3-4]. Indeed, although Montgomery averred he "was not aware that [Plaintiff's] race was African American" nor that Plaintiff "had claimed he suffered from a disability" at the time Montgomery made his decision, he indicated he relied on Hostetler's investigation, the witness statements contained therein (of only Grissom and Traylor), and a meeting with Hostetler, in deciding to terminate Plaintiff [Dkt. 30-2 at 3-4].  Hostetler's investigation, as evidenced in the record, used only limited portions of Plaintiff's personnel file, relying wholly upon an excerpt of Plaintiff's disciplinary history (that omits Grissom's positive reviews from 2012 to early 2014 [*see generally* Dkt. 30-1, Hostetler Attachment 3]), as well as the witness statements of Grissom and Traylor [Dkt. 30-1].  Hostetler includes her "Notes on Conversation with Nance and Phelps Re [the July 23, 2014 Incident]" as part of her attachments to her Affidavit [Dkt. 30-1 at 6, 102], but does not indicate whether she spoke to Nance prior to Plaintiff's termination or included this in her report to Montgomery.  Nance testified that no one spoke to him regarding the July 23, 2014 Incident until after Plaintiff's termination [Dkt. 31-4 at 78:7-79:11].  Hostetler also never interviewed Plaintiff regarding the July 23, 2014 Incident [Dkt. 30-1 at 3].

Moreover, viewed in a light most favorable to Plaintiff, the record amply reflects Grissom's racially discriminatory remarks in the workplace, namely the use of epithets like "boy" or "boo" directed at Plaintiff and others [*see, e.g.*, Dkts. 31-2 at 2-4 (remarks to Plaintiff);[15] 31-8 at 59:22-60:3 (remarks to Darren Hester), 86:12-87:16 (remarks to Plaintiff); 31-12 at 5 (remarks to Greg Tyson), 6-7 (remarks to Plaintiff); 13 (Grissom's treatment of Plaintiff)].   Given Hostetler's reliance on Grissom's description of the event, her initiating the investigation based upon Grissom's report, and Montgomery's reliance on Hostetler's investigation and report, a reasonable jury could find that Grissom was "a person with influence or leverage over the formal decisionmaker." *Laxton*, 333 F.3d at 583.   Furthermore, a reasonable jury could find on this record that Grissom's repeated use of racial epithets amounted to more than mere "stray" remarks, particularly in light of the corroborating statements of other TxDOT employees that Grissom's treatment of Plaintiff was unfair and that he subjected Plaintiff to such racial epithets [*see, e.g.*, Dkt. 31-12 at 7].   *See White*, 101 F. Supp. 2d at 491 (suggesting remarks "uttered by a supervisor with ultimate authority over the employment decision at issue" have probative value in demonstrating pretext).   Accordingly, the Court finds Plaintiff raises a genuine issue of material fact as to whether Defendants' proffered reasons for terminating Plaintiff were pretext and Plaintiff's Title VII discrimination claim should proceed to trial.[16]

---

[15] Defendants object to paragraphs 7, 11, 13, and 14 of Plaintiff's Affidavit, asserting they contain "conclusory and speculative" statements.   After reviewing these portions of Plaintiff's Affidavit, the Court concludes that the statements "or joking.  Grissom said it in such a threatening way that I was always concerned that I was going to be fired despite the fact that I wasn't doing anything wrong" in paragraph 7(a), "Following my complaints at training, no investigation occurred and nothing changed" in paragraph 11,and "try to aggravate me" in paragraph 13(b) are objectionable for being conclusory and/or speculative.  The Court strikes those statements and overrules Defendants' objections as to the other statements in paragraphs 7, 11, 13, and 14 of Plaintiff's Affidavit.

[16] Defendants proffer the same legitimate, nondiscriminatory reasons to combat Plaintiff's Title VII retaliation, ADA, and Section 504 claims [*see* Dkt. 30 at 9-13].  Plaintiff responds with the same allegations of pretext for those claims, in turn [*see* Dkt. 31 at 8, 21-24, 30-31].  Accordingly, the Court need only determine with regard to each of those claims whether Plaintiff meets his burden of proving a *prima facie* case in order for those claims to proceed to trial.

### B.    *Title VII Retaliation*

Title VII prohibits "discriminat[ion] against any . . . employee[] . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  Courts apply a similar burden-shifting framework to retaliation claims as to discrimination claims. *Medina*, 238 F.3d at 684.  Thus, to survive summary judgment, a plaintiff must first establish a prima facie case of retaliation.  If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision.  *Hague v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 560 F. App'x 328, 333 (5th Cir. 2014).  Once the defendant meets this burden, the plaintiff must demonstrate that the defendant's explanation is a pretext for unlawful retaliation.  *Id.*  To establish a *prima facie* case of Title VII retaliation, a plaintiff must demonstrate (1) he engaged in protected activity, (2) he was subjected to an action that a reasonable employee would have found materially adverse, and (3) a causal connection exists between the protected activity and the alleged retaliation.  *Hague*, 560 F. App'x at 333.

Defendants challenge Plaintiff's ability to meet the first and third elements of his *prima facie* case,[17] namely that he engaged in a protected activity, and that he can demonstrate a causal connection between his engaging in that activity and Defendants' deciding to terminate his employment [Dkt. 30 at 6-9].[18]  The Court addresses these arguments in turn.

---

[17] The Court notes again that the *McDonnel Douglas* framework applies in the Title VII retaliation context.  *Medina*, 238 F.3d at 684.

[18] Plaintiff initially alleged only that Defendants had opposed his seeking benefits after being terminated and obstructed his investigation into Defendants' alleged discrimination in retaliation to his engaging in a protected activity [Dkt. 20-1 at 12].  Plaintiff has since dropped these claims and now alleges that Defendants' termination of Plaintiff's employment was the operative retaliatory act [Dkt. 31 at 23].  Defendants do not challenge Plaintiff's characterization of the termination as a materially adverse employment action [Dkt. 30 at 9].  *See also Turner v.*

### 1.      *Plaintiff Was Engaged in Protected Activity*

An employee has engaged in protected activity if: (1) he has opposed a practice prohibited by Title VII; or (2) has participated in any manner in a proceeding under the statutes. *Keel v. Wal-Mart Stores, Inc.*, No. 1:11–cv-248, 2012 WL 3263575 (E.D. Tex. July 17, 2012) (citing *Haynes v. Pennzoil Co.*, 207 F.3d 296, 299 (5th Cir. 2000)). Protected activity may consist of an internal complaint to management regarding prohibited conduct. *Id.* (citing *Wiltz v. Christus Hosp. St. Mary*, No. 1:09-cv-925, 2011 WL 1576932, at *11 (E.D. Tex. Mar. 10, 2011) (holding that an internal complaint to management did not constitute protected activity because it did not complain of race discrimination)). If the underlying activity does not actually amount to discrimination, the employee must show that he reasonably believed that the employer's actions amounted to discrimination. *Johnson v. Georgia Pacific, LLC*, No. 08-169-JJB, 2009 WL 2849619 (M.D. La. Sept. 3, 2009) (citing *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419 (5th Cir. 2000)).

Defendants claim Plaintiff never engaged in any protected activity. Specifically, Defendants argue that "TxDOT has no record of [any of Plaintiff's alleged complaints]" [Dkt. 43 at 8 n.5]. Plaintiff argues in response that he made numerous complaints from 2001 to 2014 concerning "racially disparate treatment" he observed or heard about [Dkt. 31 at 23]. Specifically, Plaintiff asserts he complained about "racially disparate treatment" to "two TxDOT HR reps from the Austin Headquarters in June 2014 with Hostetler present" [Dkts. 31 at 23; 31-2 at 3], and that, as a result, Plaintiff was terminated shortly thereafter [Dkt. 31 at 25]. Plaintiff alleges the temporal proximity of these two events establishes a causal connection. Plaintiff also asserts the following pieces of evidence buttress the requisite causal connection between

---

*Jackson State Univ.*, 630 F. App'x 229, 231 (5th Cir. 2015) (finding termination an adverse employment action in Title VII context).

Plaintiff's engaging in a protected activity and Defendants' terminating him: (1) "TxDOT's failure to follows its standard protocol of investigating allegations of misconduct"; (2) "TxDOT's knowledge of [another employee's] complaint and investigation of race discrimination and resultant diversity training"; and (3) TxDOT's unique use, if not misuse, of its progressive disciplinary policy to terminate [Plaintiff]" [Dkt. 31 at 25]. Plaintiff argues, as well, that "Grissom[] public[ly] threat[ened] to terminate [Plaintiff] in part due to [Plaintiff's] complaints of race discrimination." *Id.* Plaintiff proffers an internal TxDOT memorandum in support of his claim that he complained and that such complaints constitute protected activity [Dkt. 31-10 at 2]. This memorandum from TxDOT Human Resources Officer Eva N. Flenniken, dated February 1, 2001, states: "Employees in your section have brought to my attention that they believe they are not being given equal employment opportunities. One employee, [Plaintiff], has asked to be given the chance to do other tasks" [Dkt. 31-10 at 2]. Read in a light most favorable to Plaintiff, this memorandum indicates Plaintiff made a complaint based on a perceived denial of equal employment opportunities in 2001. This accords with Plaintiff's averment that he began complaining to TxDOT human resources in 2001 and continued to complain "over the years" TxDOT has employed him about disparate treatment [*see* Dkt. 31-2 at 3]. Accordingly, the Court finds that Plaintiff raises a genuine issue of material fact as to whether he engaged in a protected activity.

### 2.      *A Causal Connection Exists*

The Court next addresses Defendants' assertion that no causal connection exists. To demonstrate causation in the retaliation context, a plaintiff must show that his employer would not have committed the complained-of employment action "but for" his protected activity. *See Nassar*, 133 S. Ct. at 2534; *see also Hague*, 560 F. App'x at 333. Fifth Circuit precedent reflects

that, at the *prima facie* stage, the test for establishing a causal connection is not particularly stringent, but the plaintiff must produce some evidence of this required "but-for" cause. *Ackel v. Nat'l Commc'n, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003).  Additionally, "if the only evidence of a causal link is 'mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action,' then 'the temporal proximity must be very close.'"  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).  If an employee is relying on close temporal proximity to establish the causal connection, the employee must also produce "evidence of knowledge of the protected activity on the part of the decision maker." *Ramirez v. Gonzalez*, 225 F. App'x 203, 210 (5th Cir. 2007).

Plaintiff neither alleges nor presents any evidence that Montgomery, the ultimate decisionmaker here, knew that Plaintiff had engaged in any protected activity.  Plaintiff merely alleges (but presents no evidence) that Hostetler knew of Plaintiff's reports of racial discrimination to TxDOT headquarters [Dkt. 31 at 25].  Hostetler avers to the contrary that she "ha[s] no knowledge of [Plaintiff] ever filing a grievance or complaint with anyone at TxDOT" [Dkt. 43-1 at 3].  On the other hand, Plaintiff proffers competent summary judgment evidence that Grissom threatened Plaintiff's job in response to Plaintiff's complaints of racially discriminatory treatment at work, namely after complaining of perceived racially disparate assignments [*see, e.g.*, Dkts. 31-2 at 2-3 ("boy I'll fire you"); 31-12 at 7 ("On too many occasions to count, I heard Grissom say, 'if [Plaintiff] doesn't stop complaining, I'm gonna fire him.' . . . "[C]riticiz[ing] [Plaintiff] for complaining too much when they [Grissom, Traylor , and Shearin] had created the condition for which [Plaintiff] was complaining; racially disparate treatment in the assignment of duties, and name calling[.]")].[19]  Furthermore, Plaintiff avers he

---

[19] The Court has already addressed *supra* Defendants' objections to the excerpts of Dkt. 31-2 referenced here. Defendants also object to the excerpt of Dkt. 31-12 referenced here because Defendants claim these statements

complained of race discrimination to the TxDOT Conflict Resolution team on June 24, 2014 [Dkt. 31-2 at 3],[20] one month before Hostetler commenced her investigation (on July 24, 2014) [Dkt. 30-1 at 3] and just over one month before Montgomery terminated Plaintiff's employment (on July 31, 2014) [Dkt. 30-2 at 7-8]. In light of the Fifth Circuit's holding in *Zamora* that the cat's paw analysis remains a viable theory of causation in the context of Title VII retaliation claims, the Court's analysis *supra* of the relationship between Grissom, Hostetler, and Montgomery, and the temporal proximity of Plaintiff's complaint, the Court finds that Plaintiff's evidence is sufficient to raise a genuine issue of material fact at the summary judgment stage as to the causation element of his *prima facie* Title VII retaliation case. *See* 798 F.3d at 332 ("[C]at's paw analysis remains viable in the but-for causation context."); *see also Ackel*, 339 F.3d at 385 (noting that the test for establishing but-for cause at this stage is not onerous). Accordingly, the Court finds that Plaintiff meets his burden of establishing a *prima facie* Title VII retaliation case and that his retaliation claim should also proceed to trial.

### C.    ADA and Section 504 Discrimination Claim

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and

---

relate to time-barred claims. As the Court has noted, this is not a valid objection. *See Rutherford*, 197 F.3d at 186. Accordingly, the Court overrules Defendants objection.

[20] Defendants object to Plaintiff's averment here, arguing the statements contained therein constitute "conclusory and speculative" statements that also amount to hearsay [Dkt. 44 at 2-3]. Defendants also assert these statements are improper because they relate to time-barred claims. *Id.* The Court notes again that the facts that a litigant could proffer in support of a time-barred claim are not themselves barred from consideration. *See Rutherford*, 197 F.3d at 186. Additionally, statements made by a party-opponent's agents are "not hearsay" under the Federal Rules of Evidence. FED. R. EVID. 801(d); *see Davis v. Mobil Oil Expl. & Producing Se., Inc.*, 864 F.2d 1171, 1173-74 (finding district court did not err in admitting testimony under Rule 801(d) against Mobil where testimony relayed the statement of an unidentified man running a Mobil safety meeting and wearing a Mobil hat). Plaintiff indicates that the persons who made the statements he seeks to present here were TxDOT "HR Representatives"; further, he identifies one of the speakers by first and last name and the other by first name [Dkt. 31-2 at 3]. These statement are not hearsay. Moreover, Plaintiff's statements here are neither conclusory nor speculative, they merely provide Plaintiff's account of a report he allegedly made to TxDOT representatives about what he perceived as workplace discrimination [*see* Dkt. 31-2 at 3]. The Court overrules this objection.

privileges of employment."   42 U.S.C. § 12112(a).   Similarly, under Section 504, "[n]o

otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability,

be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance . . . ."   29 U.S.C. § 794(a).

While "[b]oth of these statutes prohibit employment discrimination against qualified individuals

with disabilities, . . . the statutes govern different entities: the ADA applies only to public

entities, including private employers . . . whereas [Section 504] prohibits discrimination in

federally-funded programs and activities[.] . . ."   *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir.

2010).   Nevertheless, both statutes "are judged under the same legal standards," and "the relevant

definition of disability set forth in the ADA is applicable to claims made under [Section 504]."

*Id.* at 234-35 (citing *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 725 n.4 (5th Cir. 1995)).

As under Title VII, in connection with both the ADA and Section 504, "the employee

may either present direct evidence that [he] was discriminated against because of her disability or

alternatively proceed under the *McDonnell Douglas* burden-shifting analysis . . . ."   *EEOC v.

LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014).[21]   Stating a *prima facie* case for unlawful

termination under Section 504 entails showing (1) disability within the meaning of the ADA,

(2) qualification and ability to perform the essential functions of the job, and (3) termination

because of the disability.   *Kemp*, 610 F.3d at 235; *see also Milton v. Tex. Dep't of Crim. Justice*,

707 F.3d 570, 573 (5th Cir. 2013); *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).   Stating a

*prima facie* case for termination on the basis of one's disability under the ADA entails showing

---

[21] The Fifth Circuit has held that courts need not consider whether the employee states a *prima facie* case of disability discrimination where the employer presents legitimate, nondiscriminatory reasons for terminating the employee that the employee fails to rebut with evidence of pretext. *See Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 479 nn.2-3 (5th Cir. 2016). In the present case, the Court has determined in the Title VII context that Plaintiff has proffered "[e]vidence demonstrating that [Defendants'] explanation [for terminating Plaintiff] is false or unworthy of credence[.] . . ." *LHC Grp., Inc.*, 773 F.3d at 701 (citing *Laxton*, 333 F.2d at 578). Defendants proffer the same reasons against each of Plaintiff's claims. Accordingly, the Court must evaluate whether Plaintiff states a *prima facie* claim of disability discrimination under the ADA and Section 504.

the same elements in addition to showing that the plaintiff "was replaced by a non-disabled person or was treated less favorably than non-disabled employees." *Milton*, 707 F.3d at 573. The Court reiterates that Plaintiff bears the burden of demonstrating his *prima facie* case with competent summary judgment evidence. *See Grizzle v. Traveler's Health Network, Inc.*, 14 F.3d 261, 267-68 (5th Cir. 1994) (A "generalized [averment] stating [one's] subjective belief" will not suffice to raise a genuine issue of material fact at the summary judgment stage.), *cited with approval in Grimes v. Tex. Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1996).

### 1.    *Plaintiff Has a Disability*

The question whether a plaintiff is disabled within the meaning of the statute is a "threshold" matter. *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir. 1996). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities [of the individual]; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Milton*, 707 F.3d at 572-73 (quoting 29 U.S.C. § 12102(1)). Congress amended the ADA (through the ADA Amendments Act) in 2008 to broaden the scope of the term disability, expressing its intent in relevant part as follows:

> The purposes of this Act are . . . to reject the Supreme Court's reasoning in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) with regard to coverage under the third prong of the definition of disability and to reinstate the reasoning of the Supreme Court in *School Board of Nassau County v. Arline*, 480 U.S. 273 (1987) which set forth a broad view of the third prong of the definition of handicap under the Rehabilitation Act of 1973;
> . . .
> to reject the standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), that the terms "substantially" and "major" in the definition of disability under the ADA "need to be interpreted strictly to create a demanding standard for qualifying as disabled," and that to be substantially limited in performing a major life activity under the ADA "an individual must have an impairment that prevents or severely restricts

the individual from doing activities that are of central importance to most people's daily lives"; [as well as]

. . .

to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.

ADA Amendments Act of 2008, PL 110–325, September 25, 2008, 122 Stat 3553; *see also Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013) ("[T]he ADA [Amendments Act] primarily focuses on broadening the definition of 'disability[.]'").  The Fifth Circuit has held, however, that this broader definition and coverage of the term disability "in no way eliminated the term for the ADA or the need to prove a disability"—"[i]n other words, though the ADA [Amendments Act] makes it *easier* to prove a disability, it does not *absolve* a party from proving one."  *Neely*, 735 F.3d at 245 (noting, as well, that the elements for proving a *prima facie* disability discrimination case remain the same).

Lacking a precise statutory definition of the term "disability," courts have turned to applicable regulations for guidance as to its meaning.  *See, e.g.*, *Willis v. Noble Envt'l Power, LLC*, 143 F. Supp. 3d 475, 480-81 (N.D. Tex. 2015).  Those regulations provide the following "rules of construction":

> (i) The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.
> (ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(i), (ii).  The statute provides a list of "major life activities" that includes such activities as "walking" and "bending," as well as "working."  29 U.S.C. § 12102(2)(A).  In determining whether a disability is "substantial" within the meaning of the statutes and

regulations, some courts in this Circuit have considered "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or the expected permanent or long term impact of, or resulting from, the impairment." *See, e.g.*, *Holland v. Shinseki*, No. 3:10-CV-0908-B, 2012 WL 162333, at \*6 (N.D. Tex. Jan. 18, 2012) (quoting *Armstrong v. Boehringer Ingelheim, Pharm., Inc.*, No. 3:08–CV–1458–O, 2010 WL 2540751, at \*15 (N.D.Tex. June 21, 2010)); *see also Willis*, 143 F. Supp. 3d at 480-81. Others have not.  *See, e.g.*, *Norton v. Assisted Living Concepts, Inc.*, 786 F. Supp. 2d 1173, 1185 (E.D. Tex. 2011) (relying on the "EEOC's final regulations implementing the amendments" in finding that a plaintiff's renal cancer, "when active," substantially limited the plaintiff's major life activity of "normal cell growth" and, thus, that the plaintiff was disabled); *Benson v. Tyson Foods, Inc.*, No. 4:14-CV-00121, 2016 WL 3617803, at \*7 (E.D. Tex. July 6, 2016) (refusing to apply the aforementioned factors where the plaintiff provided "no evidence of permanent or expected long-term impact"); *Feist v. Louisiana*, No. 09-7060 c/w 11-1585, 2012 WL 12884815, at \*3 (E.D. La. Sept. 24, 2014), *rev'd on other grounds* 730 F.3d 450 (5th Cir. 2013) ("Plaintiff contends that her knee condition is a disability under the ADA, because it causes a significant and permanent limitation of her ability to walk. She claims that it 'significantly limited the amount and kind of walking [she] was able to do.' Thus, she has demonstrated that she was a qualified individual with a disability.").   The Fifth Circuit has taken a holistic approach, examining the record for evidence that an alleged disability substantially limits the plaintiff's ability to perform any of the statutory "major life activities."  *See Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 591 (5th Cir. 2016).  Though the applicable regulations provide a list of impairments that will "in virtually all cases[] result in a determination of coverage [under the actual disability prong]," *Norton*, 786 F. Supp. 2d at 1185-86 (internal quotations omitted)

(quoting 29 C.F.R. § 1630.2(j)(3)(ii)); *see also* 29 C.F.R. § 1630.2(h) ("Physical . . . impairment means—(1) Any physiological disorder or condition . . . affecting one or more body systems, such as . . . [the] cardiovascular [system] . . . ."), the Fifth Circuit has cautioned against any *per se* finding of disability—a "plaintiff must still adduce evidence of an impairment that has actually and substantially limited the major life activity on which [the plaintiff] relies." *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 223 (5th Cir. 2011) (concluding diabetic plaintiff was not substantially limited in his major life activities by his diabetes because his "treatment regimen require[d] only modest dietary and lifestyle changes").

In the present case, Defendants argue Plaintiff fails to establish his *prima facie* case of disability discrimination (under the ADA and/or Section 504) because Plaintiff cannot clear this threshold issue; he cannot prove he suffers from a "disability" [Dkt. 30 at 14-17].   Plaintiff counters that his "arterial blockages and general condition has negatively impacted his ability to bend, walk, and sustain his exertion for an extended period of time" and that Nance's testimony establishes TxDOT was aware of (and sought to accommodate) Plaintiff's alleged impairment [Dkt. 31 at 26-27].

Plaintiff presents sufficient evidence under the ADA as amended to raise a genuine issue of material fact regarding whether he is a disabled, qualified individual.   To begin, Plaintiff's alleged disability—"blockages in the arteries in [Plaintiff's] legs"—falls within the types of impairments generally considered disabilities under the applicable regulations, namely physical impairments of the cardiovascular system.   29 C.F.R. § 1630.2(h); *see also Suggs v. Cent. Oil of Baton Rouge, LLC*, No. 13-25-RLB, 2014 WL 3037213, at *4 (M.D. La. July 3, 2014) (finding genuine issue of material fact as to actual disability where plaintiff averred and presented medical evidence of his coronary/carotid artery disease); *Norton*, 786 F. Supp. 2d at 1185-86.

Plaintiff testified during deposition that his alleged disability has impaired his "walking" and "bending" abilities [Dkt. 30-3 at 98:4-9], and averred that his arterial condition further limited his abilities to "lift[], climb[], . . . and engag[e] in sustained exertion of any of these activities . . ." [Dkt. 31-2 at 7].  Walking and bending constitute "major life activities" that, if impaired, may support a finding of disability, 29 U.S.C. § 12102(2)(A); *see also Feist*, 2012 WL 12884815, at *3.  Considering Congress's admonishment to interpret the term disability liberally and the Fifth Circuit's precedent applying the ADA Amendments Act, the Court finds that Plaintiff raises a genuine issue of material fact regarding whether he is a disabled, qualified individual.  *See Cannon*, 813 F.3d at 591.  Thus, the Court turns to the third and fourth prongs of the *prima facie* case to consider whether Plaintiff shows that Defendants terminated him because of his alleged disability.

### 2.      *Plaintiff Does Not Demonstrate He Was Terminated Because of His Disability or that He Was Replaced By a Non-Disabled Person*

Once an employee establishes disability, the employee must demonstrate qualification for the position from which the employee was terminated and termination because of the alleged disability.  *See, e.g.*, *Milton*, 707 F.3d at 573.  A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  *Id.* at 572-73 (quoting 29 U.S.C. § 12111(8)); *see also Cannon*, 813 F.3d at 592 ("To be a qualified employee, [one] must be able to show that [one] could either (1) 'perform the essential functions of the job in spite of [his] disability,' or (2) that 'a reasonable accommodation of [one's] disability would have enabled [one] to perform the essential functions of his job.'").  To demonstrate causation under the ADA a plaintiff must show that "'discrimination . . . actually play[ed] a role in the employer's decision making process and ha[d] a determinative influence on the outcome.'"  *Soledad v. U.S. Dep't of Treasury*, 304 F.3d

500, 503-04 (5th Cir. 2002) (quoting *Ahrens v. Perot Sys. Corp.*, 205 F.3d 831, 835 (5th Cir. 2000)).  Under Section 504, the causation inquiry is even stricter: "Liability can only be found when the discrimination was 'solely by reason of [the plaintiff's] disability,' not when it is simply a 'motivating factor.'" *Id.* at 505.

Plaintiff has failed to demonstrate his disability was the sole reason for his termination; thus, his Section 504 claim should be dismissed.  As to his ADA claim, in considering whether Plaintiff's disability was a motivating factor, the Court notes Montgomery averred he knew neither of Plaintiff's race nor of Plaintiff's alleged disability when he decided to terminate Plaintiff [Dkt. 30-2 at 4].  Hostetler also maintained in her affidavit that Plaintiff never had submitted any paperwork to human resources seeking accommodation for his alleged disability [Dkt. 30-1 at 4-5].  Plaintiff does not dispute that neither Montgomery nor Hostetler knew of Plaintiff's disability prior to terminating Plaintiff's employment; rather, Plaintiff argues that (1) Grissom knew of his alleged disability [Dkt. 20-1 at 9-10], (2) Nance knew of his alleged disability [Dkt. 31 at 26], and (3) "TxDOT [began] issu[ing] disciplinary actions and negative comments against [Plaintiff]" suddenly and "[i]n rapid succession" after Plaintiff expressed an "increased need for doctor's appointments" [Dkt. 20-1 at 9].

Unlike in the racial discrimination and retaliation contexts discussed *supra*, where Plaintiff proffered sufficient evidence linking Grissom's racial animus to his decision to report Plaintiff to Hostetler, here Plaintiff proffers insufficient evidence of any animus on the part of Grissom or Nance toward Plaintiff for his alleged disability.  Indeed, Plaintiff's evidence here generally indicates accommodation, not animus [*see* Dkt. 31-4 at 40:9-41:18, 42:8-43:7, 50:2-8, 50:18-23].  Thus, even if Grissom influenced Hostetler, who in turn wrote a report on which Montgomery relied in deciding to terminate Plaintiff, Plaintiff fails to show that Plaintiff's

disability motivated Grissom to do so.  *See Soledad*, 304 F.3d at 503-05 (requiring proof that plaintiff's disability was a "motivating factor" under the ADA and the sole reason under Section 504).   The evidence before the Court does not establish that Nance or Grissom harbored any discriminatory animus toward Plaintiff *because of* Plaintiff's disability.  *See Kemp*, 610 F.3d at 235 (The plaintiff must show "his employer fired him *because of* his disability.").   Moreover, Plaintiff proffers only his averment that "to [his] knowledge none of [the other employees at the Sherman Yard] had a disability" in support of his allegation that other, non-disabled employees were treated more favorably [*see* Dkt. 31-2 at 4]; this is the sort of "generalized [averment of] subjective belief" the Court cannot accept as competent summary judgment evidence.  *See Grizzle*, 14 F.3d at 267-68 (finding deposition testimony that merely "state[ed] [the plaintiff's] subjective belief that discrimination occurred" was "insufficient to support a jury verdict" and, thus, insufficient to raise a genuine issue of material fact at the summary judgment stage).   And the Court is unable to locate in the record any allegation or evidence by Plaintiff that a non-disabled person replaced him following his termination.  *See Milton*, 707 F.3d at 573. Accordingly, the Court finds that Plaintiff also fails to establish a *prima facie* case of disability discrimination under the ADA.[22]

The Court notes Plaintiff has dropped his 42 U.S.C. § 1981 claim as well as his failure to accommodate and disability retaliation claims under Section 504 and the ADA [Dkt. 31 at 27-28].   The Court, therefore, now grants Defendants' Motion for Summary Judgment as to Plaintiff's remaining ADA and Section 504 disability discrimination claims.

---

[22] Because this finding eliminates Plaintiff's ADA and Section 504 claims in their entirety and Plaintiff's raises claims against Bass only under the ADA [*see* Dkt. 20-1 at 1, 13-14], the Court finds dismissal of Bass from this suit appropriate.

**CONCLUSION**

For the foregoing reasons, the Court finds Defendants' Motion for Summary Judgment [Dkt. 30] should be **GRANTED IN PART AND DENIED IN PART**.  Defendants' Motion for Summary Judgment should be **DENIED** as to Plaintiff's Title VII claims and should be **GRANTED** as to Plaintiff's ADA, Section 504, and Section 1981 claims.  As a result of the dismissal of Plaintiff's ADA and Section 504 claims, Defendant Bass should be dismissed.

It is therefore **ORDERED** that Defendants' Texas Department of Transportation and Executive Director James M. Bass, in His Official Capacity, Motion for Summary Judgment [Dkt. 30] is hereby **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the entirety of Plaintiff's claims against Executive Director James M. Bass, in His Official Capacity, are dismissed.

**IT IS SO ORDERED**.

 **SIGNED this 10th day of December, 2016.**

_____
Christine A. Nowak
UNITED STATES MAGISTRATE JUDGE